David P. Stoelting
U.S. SECURITIES AND EXCHANGE COMMISSION
100 Pearl Street, Suite 20-100,
New York, NY 10004-2616
(212) 336-0174
StoeltingD@SEC.GOV

Samantha Williams*
U.S. SECURITIES AND EXCHANGE COMMISSION
100 F Street, NE
Washington, DC 20549
Phone: (202) 551-4061
williamssam@sec.gov
*Not Admitted in S.D.N.Y.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>      Plaintiff,<br><br>  v.<br><br>MICHAEL WEISS,<br><br>      Defendant. | Civil Action No. 1:22-cv-8064 |

# COMPLAINT

Plaintiff, the United States Securities and Exchange Commission ("SEC"), for its Complaint against Defendant Michael Weiss ("Weiss" or "Defendant"), alleges as follows:

## SUMMARY

1. This case involves insider trading by Defendant in the stock of four Ernst & Young LLP ("EY") clients or prospective clients (collectively, "EY Client Companies") made while he was employed as an EY Business Development Director. Defendant's work on EY

business development teams or "pursuits" provided him with access to clients' and prospective clients' confidential and sensitive information. In particular, Weiss learned material nonpublic information concerning pending acquisitions, prospective business strategies, and financial projections concerning EY Client Companies. He then knowingly purchased securities of those companies for his personal gain and in violation of the duty he owed to both EY and EY Client Companies.

2. Through his illicit trading of EY Client Companies' stock, Defendant obtained total ill-gotten gains of $10,286. Because of his trading, EY determined that Defendant violated several EY policies.

3. By virtue of the conduct alleged herein, Defendant violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. Unless he is permanently enjoined, he will again engage in the acts, practices, transactions, and courses of business set forth in this Complaint and in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

4. The SEC brings this action pursuant to the authority conferred upon it by Exchange Act Sections 21(d) and 21A [15 U.S.C. §§ 78u(d); 78u-1].

5. The SEC seeks a final judgment: (a) permanently enjoining Defendant from violating the federal securities laws and rules at issue; (b) ordering Defendant to disgorge his ill-gotten gains, together with prejudgment interest thereon pursuant to Exchange Act Sections 21(d)(5) and (d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)]; (c) ordering Defendant to pay civil money penalties pursuant to Exchange Act Sections 21A and 21(d)(3) [15 U.S.C. §§ 78u-1; 78u(d)(3)]; and (d) ordering such other and further relief as this Court deems just

and proper.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over claims alleging violations of the Exchange Act, pursuant to Exchange Act Sections 21(d), 21A, and 27 [15 U.S.C. §§ 78u(d); 78u-1; 78aa].

7. Venue is proper in this District pursuant to Exchange Act Section 27 [15 U.S.C. § 78aa], which confers venue in any District where any act or transaction constituting the securities law violation occurred. Because EY Client Companies' stock traded on the New York Stock Exchange ("NYSE"), which was headquartered in New York, New York during the relevant period, all of Defendant's unlawful securities transactions occurred in this District.

## DEFENDANT

8. **Weiss**, a resident of North Carolina, served as a Business Development Director at EY from August 2003 until January 2021.

## RELEVANT ENTITIES

9. **EY** is a professional service limited liability partnership, headquartered in New York, New York, with offices located throughout the United States. EY provides auditing, consulting, and tax services to various entities, including companies whose securities are registered with the SEC and trade in the U.S. markets.

10. **Company 1** is a global packaging company incorporated in Delaware and headquartered in North Carolina. Company 1 stock trades on the NYSE and is registered with the SEC pursuant to Section 12(b) of the Exchange Act.

11. **Company 2** was a personal finance company incorporated in Delaware and headquartered in Indiana. During the relevant period, Company 2 stock traded on the NYSE and was registered with the SEC pursuant to Section 12(b) of the Exchange Act. In November 2015, Company 2 completed its acquisition of a subsidiary of Company 3

and changed its corporate name while continuing to trade on the NYSE.

12. **Company 3** is a multinational investment bank incorporated in Delaware and headquartered in New York.  Company 3 stock trades on the NYSE and is registered with the SEC pursuant to Section 12(b) of the Exchange Act.

13. **Company 4** is a freight transportation company incorporated in Delaware and headquartered in Connecticut.  Company 4 stock trades on the NYSE and is registered with the SEC pursuant to Section 12(b) of the Exchange Act.

## FACTS

### I. DEFENDANT OWED A DUTY TO KEEP INFORMATION ABOUT EY CLIENT COMPANIES CONFIDENTIAL AND NOT TO TRADE ON THAT INFORMATION

14. As a Business Development Director with EY, Defendant worked on over 50 national competitive pursuits of audit and non-audit business opportunities involving EY clients and prospective clients, including EY Client Companies.  Defendant was subject to multiple obligations to refrain from using nonpublic information obtained through his work on these pursuits.

15. Defendant signed a confidentiality agreement as a condition of his employment with EY that included, in relevant part, an agreement that he would "not make any private use of 'insider information' that may come to my attention because of my employment with [EY]. . . . I understand the term 'use' includes but is not limited to anyone's purchase or sale of securities influenced by such information, access to which is directly or indirectly due to my relationship with [EY]."

16. Defendant was subject to EY's Global Code of Conduct, which prohibited employees from using confidential information for personal gain, and EY's Insider Trading Global Policy, which explicitly warned its employees:  "[F]requently, when delivering projects

4

to our clients, you will have access to confidential and sensitive information that's not publicly available.  To use this information for your benefit or anyone else's, is a breach of insider trading laws and regulations." Defendant understood that he should not use confidential information to trade in the stocks of EY clients and potential clients and expressed familiarity with insider trading laws prohibiting securities trading based on material nonpublic information obtained through work.

17. Defendant signed annual affirmations indicating that he carefully read, understood, and agreed to comply with EY's Global Code of Conduct and Insider Trading Global Policies, among others, as a condition of his employment.

18. Defendant also owed a duty of trust and confidence directly to EY Client Companies.  At EY, Defendant often worked on publicly traded company pursuits that provided him with access to highly confidential business information, including information about potential acquisitions, prospective corporate and tax transactions and strategies.

II. **DEFENDANT TRADED IN EY CLIENT COMPANIES' STOCK**

A. **Defendant's Trading In Company 1 Stock**

19. Throughout 2014, Weiss was EY's Business Development leader for the firm's audit pursuit of Company 1.  On or around July 14, 2014, Company 1 gave EY and other audit pursuit participants access to confidential corporate and financial information in a secure data room.  As a condition of participation in the Company 1 pursuit, EY and its employees agreed that all "information contained in this RFP [pursuit] is proprietary to [Company 1]" and "may not be used or shared with any other parties for any other purpose, without first obtaining [Company 1]'s written consent."

20. In June 2014, through his work on the EY pursuit, Weiss learned of Company

1's confidential plan to relocate its global headquarters.  On or before July 21, 2014, Weiss told other EY personnel on the pursuit team that he had "combed through" Company 1's data room.  On or before July 22, 2014, Weiss participated in a series of internal meetings and debriefings concerning an EY assurance partner's meetings with Company 1 senior management.

21.     Before the market opened on July 23, 2014, while in possession of Company 1's material nonpublic information, Defendant purchased 5,000 shares of Company 1 stock for $164,525.09.  Defendant had never purchased Company 1 securities before July 23, 2014.

22.     After the market opened on July 23, 2014, Company 1 and the State of North Carolina announced that Company 1 was relocating its global headquarters, resulting in operational efficiencies by moving 1,300 employees from three divisions, R&D facilities, and its corporate offices into a single location.

23.     Before the market opened on July 30, 2014, Company 1 announced its second quarter earnings for 2014.  In its earnings call, Company 1's CEO described the relocation, which provided Company 1 with up to $36 million in tax breaks over 12 years, as part of Company 1's "change the game puzzle" to "dramatically increase innovation, new business models and collaboration, gain efficiencies and accelerate change."  Shares of Company 1 closed up 3.25% from the previously day's closing price.

24.     On August 18, 2014, Defendant sold all 5,000 of his Company 1 shares, realizing illegal profits of $3,113.

25.     Defendant's trades were effectuated through the facilities of the NYSE, which is a national securities exchange.

26.     Defendant did not report these trades to anyone at EY as required by the above-referenced policies and the annual affirmations he executed.

27. Defendant knew or was reckless in not knowing that his purchase of Company 1 stock while in possession of material nonpublic information concerning Company 1's relocation and its prospective corporate strategy, financial, and audit plans was in breach of the duty of trust and confidence that he owed to both EY and Company 1.

### B. Defendant's Trading in Company 2 and Company 3 Stock

28. In January 2015, Company 2 hired EY to perform due diligence efforts concerning Company 2's potential bid on the sale of Company 3's subprime subsidiary. Although Company 3, another EY client, had publicly disclosed its intent to sell its subsidiary via a bidding process, EY gained access to material nonpublic information about the potential acquisition during the due diligence process.

29. On or around January 22, 2015, Defendant joined the Company 2 pursuit team, one day after expressing that he would "love the chance" to do so. Between January 22 and 28, 2015, Defendant received non-public information connected to EY's due diligence efforts with regard to a confidential business combination. Defendant later described Company 2's acquisition as both "super confidential" and a "highly confidential transaction that could double the size of the company, a potential corporate HQ relocation and a compressed timeline."

30. On January 28, 2015, Defendant purchased 1,000 shares of Company 2 stock for $32,221.59. Defendant had never purchased Company 2 securities before January 28, 2015.

31. On February 2, 2015, Defendant purchased 1,000 shares of Company 3 stock for $47,027.69.

32. On February 3, 2015, Defendant attended an EY strategy meeting during which additional material nonpublic information about Company 2's potential acquisition was discussed.

33. On February 6, 2015, Defendant sold all 1,000 of his Company 2 shares for $34,290.32, realizing illegal profits of $2,168.73.

34. On February 20, 2015, press reports indicated that Company 2 was in the lead to buy Company 3's subsidiary for over $4 billion. On February 23, 2015, press reports indicated that Company 2 was in exclusive talks to acquire Company 3's subsidiary and could have a final deal in days.

35. On February 25, 2015, Defendant sold all 1,000 of his Company 3 shares for $52,032.35, realizing illegal profits of $5,004.66.

36. On March 2, 2015, Company 2 announced it had completed its $4.25 billion acquisition of Company 3's subsidiary.

37. Defendant's trades were effectuated through the facilities of the NYSE, which is a national securities exchange.

38. Defendant did not report these trades to anyone at EY as required by the above-referenced policies and the annual affirmations he executed.

39. Defendant knew or was reckless in not knowing that his purchases of Company 2 and Company 3 stock while in possession of material nonpublic information concerning Company 2's pursuit to acquire Company 3's subsidiary were in breach of the duty of trust and confidence that he owed to both EY and Company 2.

C. **Defendant's Trading in Company 4 Stock**

40. Defendant claimed to have leveraged relationships with Company 4 senior management to earn EY sole source work of more than $2 million prior to 2015. Defendant also assisted EY's audit teams with Company 4 pursuit opportunities at various times during 2015.

41. On September 9, 2015, at 3:55 p.m., an EY partner informed Defendant that Company 4 was in the process of making a "sizeable yet to be announced acquisition." Less than two minutes later, at 3:57 pm, Defendant purchased 1,000 shares of Company 4 stock. On September 9, 2015, at 4:31 pm, Company 4 announced that it was acquiring a large trucking company.

42. Defendant's trade was effectuated through the facilities of the NYSE, which is a national securities exchange.

43. Defendant did not report his trade to anyone at EY as required by the above-referenced policies and the annual affirmations he executed.

44. Defendant knew or was reckless in not knowing that his purchases of Company 4 stock while in possession of material nonpublic information concerning its acquisitions and financing were in breach of the duty of trust and confidence that he owed to EY.

45. Although Defendant knowingly purchased these securities for his personal gain, he did not profit from this September 2015 purchase of Company 4 stock.

**CLAIM FOR RELIEF**
**Violations of Exchange Act Section 10(b) and Rule 10b-5**
**Thereunder**

46. The SEC realleges and reincorporates paragraphs 1 through 45 as if fully set forth herein.

47. Defendant, directly or indirectly, in connection with the purchase or sale of securities by the use of means or instrumentalities of interstate commerce, or by the mails or the facilities of a national securities exchange, knowingly or recklessly has (i) employed devices, schemes, or artifices to defraud, (ii) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading, and/or (iii) engaged in acts, practices, or courses of business which operated or would have operated as a fraud or deceit upon other persons.

48. By reason of the foregoing, Defendant, directly violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5].

**PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court enter a Final Judgment:

**I.**

Finding that Defendant violated the provisions of the federal securities laws as alleged herein;

**II.**

Permanently enjoining Defendant from, directly or indirectly, engaging in conduct in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 promulgated thereunder [17 C.F.R. §§ 240.10b-5];

**III.**

Ordering Defendant to disgorge all ill-gotten gains described herein plus prejudgment interest;

**IV.**

Ordering Defendant to pay civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1]; and

**V.**

Granting such other and further relief as this Court may deem just and proper.

Dated: September 21, 2022

Respectfully submitted,

*/s/ David P. Stoelting*
David P. Stoelting
U.S. SECURITIES AND EXCHANGE COMMISSION
100 Pearl Street, Suite 20-100,
New York, NY 10004-2616
(212) 336-0174
StoeltingD@SEC.GOV

## CERTIFICATE OF SERVICE

I hereby certify that on September 21, 2022, I sent the foregoing document by email to the following:

William R. Terpening
Terpening Law PLLC
221 West 11th Street,
Charlotte, North Carolina 28202
terpening@terpeninglaw.com
*Counsel for Michael Weiss*

*/s/ David P. Stoelting*
David P. Stoelting